# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>   vs.<br><br>DORIAN DUANE TOPPS, ISAIAH JAMES CROSS and KEVIN GLOVER,<br><br>         Defendants. | No. 3:20-cr-00012-TMB-DMS<br><br>**REPORT AND RECOMMENDATION[1] TO DENY WITHOUT PREJUDICE THE MOTION FOR REASONABLE ACCESS TO COUNSEL AND DIGITAL EVIDENCE AND SET DEADLINE FOR INSTALLATION OF ADDITIONAL COMPUTERS [Doc. 73]** |

## I. INTRODUCTION

Defendants Dorian Topps, Isaiah Cross, and Kevin Glover move for reasonable access to counsel and digital evidence in response to the Alaska Department of Corrections (DOC)'s COVID-19 protocols. (Doc. 73). Defendants allege that their Sixth Amendment right to assistance of counsel and Fifth Amendment right to due process is impeded by the DOC's restrictions on attorney visitation and discovery review since March 2020. (Doc. 73 at 1-2). Defendants initially asked the Court to declare the state statute prohibiting the use of computers in prison cells, Alaska Statute § 33.30.015, unconstitutional and to permit prisoners access to iPads or similar devices for use in their cells. (Doc. 73 at 11). The government responded in opposition, denying authority to remedy defendants' complaints and challenging the Court's jurisdiction to hear those complaints in this criminal proceeding. (Doc. 75 at 1-2).

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel           1

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 1 of 35

The Court issued tentative conclusions of law finding (1) the defendants have standing to bring their claims, (2) the Court has jurisdiction to hear those claims in this criminal proceeding, and (3) the Court must certify the question of constitutionality to the State of Alaska. (Doc. 85 at 3-6).

The State of Alaska intervened, and the parties agreed that the Court need not find Alaska Statute § 33.30.015 unconstitutional to grant defendants relief. (Doc. 99 at 2; Doc. 115 at 49). Access to iPads in their cells is not necessary to satisfy defendants' complaints, instead, other means of increasing access could suffice. (Doc. 102 at 4; Doc. 115 at 138). An evidentiary hearing took place on August 28, 2020. (Doc. 115). The Court requested supplemental affidavits and/or briefing from the State of Alaska to resolve remaining factual questions. (Doc. 122). The state submitted two supplemental declarations. (Docs. 120 & 124).

Defendants' motion is now ripe for consideration. For the following reasons, the Court recommends the District Court DENY without prejudice the motion for reasonable access to counsel and discovery.

## II. STATEMENT OF FACTS

Mr. Glover, Mr. Topps, and Mr. Cross are co-defendants charged with distribution of a controlled substance pursuant to 21 U.S.C. § 841(a)(1) and (b)(1)(A). They were denied pretrial release and are currently detained at the Anchorage Correctional Complex (ACC). ACC's response to the COVID-19 pandemic changed how ACC inmates, including the defendants in this case, review discovery and meet with counsel. Those changes have sparked concern among the defendants that they cannot adequately prepare for trial under these conditions. (Doc. 73 at 1-2). They complain about the suspension of in-person visitation with attorneys, as well as limitations on their ability to review discovery. (Doc. 73 at 8-12).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 2

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 2 of 35

**A. The Department of Corrections' COVID-19 response**

There are no federal prisons in the State of Alaska; the United States therefore contracts with the State of Alaska Department of Corrections (DOC) to house federal inmates. (Doc. 115 at 181-82). ACC is composed of two facilities: Anchorage Jail East and Cook Inlet Pre-Trial West. (Doc. 115 at 155). Inmates are housed in various modules within each facility. (Doc. 115 at 173). As of September 8, 2020, there were 116 federal inmates in ACC. (Doc. 120 at 3). This number is up from 106 on August 28, 2020. (Doc. 115 at 182). Mr. Hough, Director of Institutions at DOC, testified that ACC is somewhere between the high eighties to low nineties percent capacity. (Doc. 115 at 38)

The DOC, through Mr. Hough, describes their COVID response in two-parts. Their main goal is to prevent the introduction of COVID into their prison system, but knowing that introduction is inevitable, they also need to be able to quickly isolate and prevent its spread. (Doc. 115 at 22 & 84). DOC officials generally meet three times a week to discuss the adequacy of DOC's COVID response. (Doc. 115 at 23). Inmates have expressed their fears to DOC about COVID infection (Doc. 115 at 85); and DOC worries about maintaining order if an outbreak occurs (Doc. 115 at 85). As of August 28, there have been no COVID-related deaths in any DOC facility. (Doc. 115 at 97). Out of all the inmates who have tested positive for COVID, only three have been from internal transmission—the rest were newly remanded-inmates, and the infection was discovered during the testing and quarantine phase of detention. (Doc. 115 at 97-98).

A growing concern for the DOC is overcrowding; DOC facilities throughout the state are currently at 90% capacity. (Doc. 115 at 38). Mr. Glover testified that he is currently sleeping in a plastic container cot on the floor of a two-bunk cell with two other people. (Doc. 115 at 156).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                3

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 3 of 35

COVID makes it more difficult to disperse inmates among facilities in order to manage populations, since every time an inmate is moved, that inmate must undergo testing and 14-day quarantine. (Doc. 115 at 38). DOC has a higher ratio of pretrial inmates than normal.[2] (Doc. 115 at 58). This is due to the lack of case resolution during the pandemic, in part because of the suspension of jury trials. (Doc. 115 at 58). This is also because inmates are not getting familiar enough with counsel or the discovery materials in their case to decide whether to plead guilty or request a trial. (Doc. 115 at 99; *See* Doc. 115 at 164).

### 1. Inmate quarantine and cohort strategy

To prevent the introduction and spread of COVID in DOC facilities, the DOC utilizes a quarantine and cohort system. (Doc. 115 at 41-42). When an inmate is brought to a DOC facility, he is subject to quarantine before release into the prison's general population. (Doc. 115 at 174).

ACC has designated one of its facility modules as pre-quarantine. (Doc. 115 at 85). Newly remanded inmates are housed in the pre-quarantine module until it is full, which usually takes two or three days. (Doc. 115 at 85, 113). Inmates are then separated and subjected to a 14-day quarantine. (Doc. 115 at 85). While in quarantine, inmates are housed in single person cells. (Doc. 115 at 113). Inmates are still given access to phones to call family and counsel and computers to review some discovery material, but they do not have access to television or regular social interaction like they get in general population. (Doc. 115 at 113-14). After the 14 days are up, those inmates move to general population where they can leave their cells throughout the day and are no longer subject to quarantine-like restrictions. (Doc. 115 at 174-75). ACC tries to keep general population inmates together in cohorts that move together to meals, recreation, and other

---

[2] Total number of pretrial inmates at ACC was not produced in the record.

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                    4

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 4 of 35

areas in order to isolate potential COVID exposure to a single cohort. (Doc. 115 at 24-25).

If an inmate leaves the prison for a court proceeding or for a supervised visit with counsel, he must undergo the same quarantine before returning to his cell in general population. (Doc. 115 at 41-42). When an inmate leaves the prison and returns, there's a risk that any possessions left in his cell will disappear as he quarantines for the 14 days, according to John Olson, Chief Deputy of the U.S. Marshal Service for the District of Alaska. (Doc. 115 at 188). Inmates are also subject to quarantine when moved from facility to facility for the purposes of population control by DOC. (Doc. 115 at 123).

### 2. Suspension of in-person visitation with counsel

Following the Center for Disease Control (CDC)'s COVID guidelines, the DOC suspended in-person visitation with counsel in ACC in March. (Doc. 115 at 22, 80). Mr. Hough could not provide a timeframe for when in-person visitation with counsel might resume, but he stated that officials are constantly reviewing CDC recommendations and advice from DOC medical officers regarding reopening DOC facilities. (Doc. 115 at 23-24).

Mr. Hough testified that the CDC advises against attorney in-person visits to prisons, and though this may differ from CDC guidelines regarding banks, grocery stores, and other places, he explained that it is necessary since people cannot social distance inside detention centers. (Doc. 115 at 119-20). Facilities like ACC are "not set up for a six-foot radius between everybody at all times." (Doc. 115 at 82). ACC inmates must congregate for activities such as meals and recreation. (Doc. 115 at 82). They don't have the choice to social distance, he said. (Doc. 115 at 82). Mr. Glover testified that inmates are sandwiched together to use the module phones. (Doc. 115 at 157). Prison inmate populations are also at higher risk for developing serious health complications from COVID infection. (Doc. 115 at 97). This is due to prison populations being

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 5

Case 3:20-cr-00012-TMB-MMS    Document 135    Filed 10/01/20    Page 5 of 35

older, on average, and in poorer health than the general public, according to Mr. Hough. (Doc. 115 at 81).

### a. Private rooms for unmonitored attorney phone calls

The visitation rooms at ACC are no longer configured for in-person visitation but have been converted into rooms for private attorney-client phone calls and discovery review. (Doc. 115 at 45, 119). In fact, every room available at ACC that could receive a phone line has been modified to do so, Hough said. (Doc. 115 at 23). The amount of private attorney-client phone rooms now exceeds the number of attorney-client visitation rooms available to inmates pre-COVID. (Doc. 115 at 77). Attorney calling hours are between 8:00 a.m. to 9:00 p.m., Monday through Friday, and 9:00 a.m. to 5:00 p.m. on Saturday and Sunday. (Doc. 115 at 26). Calling hours have been expanded at another DOC facility, Goose Creek. (Doc. 115 at 26). Mr. Hough testified that calling hours would also be expanded at ACC, if needed. (Doc. 115 at 26).

Mr. Hough testified that he believes there is typically a one-day notice period to set up an attorney call in a private room, but ACC has been able to accommodate inmates with much less notice than that. (Doc. 115 at 27). The normal process is for the inmate to call their attorney via public phones located in their modules and ask the attorney's office to contact the prison to set up a private call. (Doc. 115 at 27). Mr. Hough testified that he has not received any grievances from inmates complaining they are unable to schedule a private attorney call. (Doc. 115 at 93). Inmates are provided 2-3 free phone calls each week. (Doc. 115 at 109). In addition to the free phone calls, defense counsels' phone numbers are programed into the prison phone system and inmates are not charged for calls to those numbers. (Doc. 115 at 109, 177).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                          6

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 6 of 35

### b. Attorney-client meetings on Polycom computer units

There are six Polycom videoconferencing units located at ACC.[3] (Doc. 115 at 31). The Polycom system is owned and utilized by the state court system for court proceedings, according to Mr. Hough. (Doc. 115 at 30-31). The Polycom units are set up some distance from an inmate appearing by video. (Doc. 115 at 137). The inmate does not have access to a mouse or keyboard to zoom in or adjust the volume on the unit. (Doc. 115 at 137). Defense attorneys have been allowed access to the Polycom units for attorney-client communication during certain times, when they are not in use by the courts. (Doc. 115 at 135). Mr. Hough explained, "it was our intent to try to get that so that all attorneys could use it," but "it became apparent that that is not a reality with the volume of need." (Doc. 115 at 31). Further, coordinating times with the court proved difficult for defense counsel and sometimes clients weren't brought to the Polycom rooms when they had a scheduled visit. (Doc. 115 at 135).

### 3. Suspension of the hand delivery of discovery and legal documents

In-person mail delivery to ACC was suspended at the same time as in-person visitation. (Doc. 115 at 39-40). Previously, attorneys from the Office of the Federal Public Defender routinely hand-delivered mail for their clients, according to defense counsel. (Doc. 115 at 39). The facility still receives mail from the post in the same manner as it did pre-COVID, though the speed of which mail moves through the post may be affected by the pandemic, according to Mr. Hough. (Doc. 115 at 39). Inmates do not have access to any electronic mail. (Doc. 115 at 109).

Inmates can keep one box of paper discovery in their cells but cannot keep digital forms of discovery. (Doc. 115 at 11-13). Inmates are allowed a box of personal property kept outside

---

[3] Mr. Hough stated that one Polycom unit was down at ACC as of September 8, but that he expected it to be back online soon. (Doc. 120 at 2-3).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                      7

their cells in an ACC storage room where electronic discovery can be stored. (Doc. 115 at 13). DOC allows for electronic discovery to be stored on either CDs or a thumb drive, though they prefer thumb drives, since the CD drives of prison computers are sometimes destroyed or manipulated by inmates for other purposes, Mr. Hough said. (Doc. 115 at 13-14).

When a prisoner wishes to access digital discovery, he must submit a Request for Interview, commonly called a "copout" by inmates. (Doc. 112 at 13-14). This request is given to the module officer, who then directs the request to appropriate prison administrators who can schedule the discovery review on a computer which is not connected to the internet. (Doc. 115 at 14). Prison regulations mandate that these requests be responded to within a "reasonable" time. (Doc. 115 at 15). Mr. Hough testified that discovery requests are responded to the same day, assigning the inmate an appointment "a day out or something." (Doc. 115 at 15). At the time of their appointment, a corrections officer takes the inmate to an ACC computer and gives the inmate the requested electronic discovery. (Doc. 115 at 13). At ACC, an inmate may review discovery in this manner for a scheduled block of an hour and a half. (Doc. 115 at 20). Inmates can request more time by submitting an additional request. (Doc. 115 at 20-21).

Mr. Hough testified that if an inmate did not get a response from his Request for Interview, that inmate should file a grievance through the DOC's grievances process. (Doc. 115 at 15). Unresolved grievances would ultimately make their way to Mr. Hough. (Doc. 115 at 88). Mr. Hough cannot recall any inmate grievances relating to an inmate's lack of access to a computer for discovery review. (Doc. 115 at 16). Mr. Hough testified that inmates learn of this grievance process during their orientation to the prison and it is also in the prisoner handbook supplied when an inmate first arrives at a DOC facility. (Doc. 115 at 106).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 8

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 8 of 35

#### 4. COVID discovery review limitations

At ACC, inmates can review electronic discovery by themselves on facility computers that cannot connect to the internet. (Doc. 115 at 16-17). During the hearing, Mr. Hough testified that ACC has 14 of these non-networked computers, four of which were added in August. (Doc. 115 at 16-17). In a supplemental declaration filed on September 8, Mr. Hough testified there are currently only eight non-networked computers for discovery, though more have been purchased and, once online, will bring that number to 16. (Doc. 120 at 2). In his declaration filed September 22, Hough stated there are 15 non-networked computers for reviewing discovery. (Doc. 124 at 2). This number fluctuates as computers break and are repaired, Hough said. (Doc. 124 at 2).

Hough testified those computers were unoccupied 35% of the time they were available to inmates in during the month of August, indicating that they were not being used at capacity. (Doc. 115 at 21-22). However, some discovery computers are located in the same room, though Mr. Hough does not know how many. (Doc. 115 at 89). Since only one inmate is allowed in the room when viewing discovery, this leaves some discovery computers unusable at times. (Doc. 115 at 103). Two of the non-networked computers are set aside for use by inmates in segregation status. (Doc. 115 at 18).

Before the pandemic, defense counsel and their investigators could bring discovery materials to their clients in-person, utilizing their own computer or electronic device to view it with their client. (Doc. 115 at 100). Protective orders covering certain discovery materials often prohibit leaving discovery with an inmate in a DOC facility and thus require counsel to take the material with them when they leave. (*See* Doc. 115 at 151). When in-person visitation was suspended in March, counsel attempted to emulate this sort of meeting via Polycom videoconferencing, utilizing the screen share function. (Doc. 115 at 136-37). As described *supra*,

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                             9

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 9 of 35

those Polycom units are limited in availability, as they are primarily for use in court proceedings.

**B. Mr. Glover's complaints regarding lack of access to counsel and discovery[4]**

Mr. Glover was arrested in February of 2020. (Doc. 115 at 169). He has been at ACC since then. (Doc. 115 at 155). Mr. Glover was originally brought to Anchorage Jail East but was later transferred to Cook Inlet Pre-Trial West. (Doc. 115 at 155). Glover shares a module with 64-70 prisoners. (Doc. 115 at 155). He shares his cell with two other inmates. (Doc. 115 at 156).

The primary evidence in this case against Glover includes audio and video materials subject to a protective order. (Doc. 115 at 143). The discovery in this case amounts to approximately 2,417 pages of documents and 4 hours of video and audio recordings, according to government counsel. (Doc. 118 at 2-7). During the hearing, Mr. Glover stated, "I have not waived no time at all besides the trials. I am not agreeing to . . . the delay." (Doc. 115 at 164). Stating further that "before I make any decision in my case, I would like to see everything [co-defendants] did . . . so I can have a clear picture on my decision if I want to take a deal or take this to trial." (Doc. 115 at 164).

**1. Mr. Glover's attempts to review discovery by himself**

In April, while Glover was still at Anchorage Jail East, he received a letter informing him that his attorney had sent discovery to review (Doc. 115 at 158). Mr. Glover then filed a Request for Information to view the discovery. (Doc. 115 at 159). A week went by with no response to his request. (Doc. 115 at 159-60). Mr. Glover then filed a second request to view his discovery. (Doc. 115 at 159-60). After another week passed, Mr. Glover expressed his concern to his module officer that he had still not received a response to either of his requests. (Doc. 115 at

---

[4] Mr. Topps and Mr. Cross did not provide any information about their efforts to have video meetings with counsel or review of discovery. They also did not provide any information related to how long they have been in custody.

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 10

160). The module officer advised Glover to file a third one, which he did. (Doc. 115 at 160). Glover was then transferred to Cook Inlet West. (Doc. 115 at 160).

After the transfer, Mr. Glover still had not received a response to his requests, so he tracked down the compliance officer on the officer's inspection day and asked him, "why is it taking so long to see my CD?" (Doc. 115 at 160). The officer told Glover he would get it from Anchorage Jail East and schedule a time. (Doc. 115 at 160-61). A week after that—four weeks since his initial request—Glover was able to review his electronic discovery. (Doc. 115 at 161).

Mr. Glover was given a two-hour scheduled block to view discovery at a DOC computer. (Doc. 115 at 161). Glover testified that he was forced to leave early, only receiving an hour and half of discovery review time. (Doc. 115 at 161). Glover said this was not enough time to read the reports and understand them; he ended up skimming through the documents. (Doc. 115 at 161). Glover was frustrated by both the protective order that limited and redacted the documents that could be left with him at DOC, as well as the short amount of time to review it all. (Doc. 115 at 168-169). He did not file an additional review request; when asked why, Glover stated, "it's a waste of time up there in that room for no reason." (Doc. 115 at 168). Glover also complained that he was not able to use the bathroom while reviewing discovery. (Doc. 115 at 168). Mr. Glover was provided with some redacted paper discovery as well. (Doc. 115 at 171). However, he cannot review that discovery privately in his cell, as any review would be in the company of two other inmates. (Doc. 115 at 156).

When asked why he did not utilize the prison's grievance process to report the problems with scheduling and viewing discovery, Mr. Glover testified, "I never thought I had to put a grievance in." (Doc. 115 at 169). Mr. Glover also testified that he did not receive a prison orientation at any time during his detention, stating that "they don't provide an orientation in

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel
11

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 11 of 35

pretrial." (Doc. 115 at 172). When asked again, Mr. Glover insisted, "there is no such thing as orientation." (Doc. 115 at 172).

Glover also testified that he was not given a prisoner's handbook. (Doc. 115 at 173). Instead, when he came to ACC he was searched, given a prison uniform, and brought to his cell. (Doc. 115 at 172). He explained that when you are at ACC awaiting trial, you do not receive an orientation or prisoner handbook; those things only happen when you are later convicted and sentenced to a penitentiary. (Doc. 115 at 173).

Mr. Hough stated by supplemental declaration that ACC procedures are outlined in the prisoner orientation video that is played on loop in the booking area and intake module at ACC. (Doc. 124 at 4). The procedures are also described in the prisoner handbook that is laminated and chained to the wall of every module. (Doc. 124 at 4).

### 2. Mr. Glover's attempts to consult and review discovery with counsel

Mr. Glover testified that he calls his attorney's office every other day on the public phones located in his module. (Doc. 115 at 171). These phones are available to inmates on a first come, first serve basis. (Doc. 115 at 29-30). All the inmates in a module are released from their cells and given access to the phones at the same time. (Doc. 115 at 111). There are four phones located on the module wall for use by all 64-70 inmates in the module, with no dividers between the phones. (Doc. 115 at 157). Mr. Glover testified that whenever he is on the phone there is a line of inmates behind him. (Doc. 115 at 157). The phones are located so close together that from the middle phones in the bank, you can touch all four phones. (Doc. 115 at 157). Glover testified that the inmates bump into each other, "like we're sandwiched to each other while we're on the phones." (Doc. 115 at 157).

There is no privacy to these phone conversations; Glover can hear all the conversations

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 12

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 12 of 35

around him, and others can hear his conversations—including the module officer on duty. (Doc. 115 at 158). These conversations are also recorded by DOC. (Doc. 115 at 176). Mr. Hough acknowledged that these public phones "should not be used for private conversations with their attorney . . . there is just no privacy there." (Doc. 115 at 28-29).

Those public phones were not meant for substantive discussions with counsel, instead, inmates can use the public phones to call their attorney's office and ask them to schedule a private phone call at the prison. (Doc. 115 at 144). They can request this meeting without providing details on what they would like to discuss. (Doc. 115 at 144). As mentioned *supra*, inmates do not have to pay for calls to their attorney; counsel's phone number is programed into the system so that even an inmate without money in his account can place the call. (Doc. 115 at 109, 177). When Mr. Glover calls his attorney on these phones, his counsel refuses to talk about the details of his case and cautions Glover about mentioning anything directly related to the case. (Doc. 115 at 176). Mr. Hough was not aware of a process that would allow the inmate to request and set-up a private attorney call himself, but that it should be done by counsel after talking to their client on the public module phones. (Doc. 115 at 27).

Mr. Glover does not allege that he was unable to schedule a private phone call with counsel through this process, but he noted it is difficult to discuss aspects of his case over the limited phone time with counsel. (Doc. 115 at 163). Glover expressed his frustration with never having seen his counsel in-person, stating, "I would rather have human contact with you face to face so I can be able to look in your eyes." (Doc. 115 at 163). He discussed the value of face-to-face contact in order to establish mutual trust, before making important decisions regarding his case. (Doc. 115 at 163).

Defense counsel was also able to conduct one or two successful Polycom visits with Mr.

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                           13

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 13 of 35

Glover. (Doc. 115 at 136). However, there were problems with the screen share tool when Mr. Glover attempted to review discovery. (Doc. 115 at 136-37). Not being able to get close to the unit, or for counsel to zoom in, made reviewing video evidence particularly difficult for Mr. Glover. (Doc. 115 at 162). Mr. Glover, who has trouble seeing items far away, testified that he was unable to identify the person in the video from watching it on Polycom, but might be able to if he was looking at the video closer. (Doc. 115 at 162). Inmates are unable to manipulate the screen or turn the volume up on a Polycom unit and counsel must scroll through the discovery one page at a time—which proves very time consuming. (Doc. 115 at 137). It is particularly difficult in Anchorage Jail East facility, where inmates are chained to chairs some distance from the unit. (Doc. 115 at 162-63).

### C. Defendants' proposed solution: iPads for discovery review

The Federal Defenders Office, in collaboration with the Court, acquired approximately 28 iPads for use by federal defendants at DOC facilities to review preloaded discovery. (Doc. 73-1 at 8). Internet access on those iPads was to be eliminated or blocked. (Dkt. 73 at 2). Use of these iPads would increase inmate access to discovery and "save hundreds of hours of defense team time monthly related to redaction, discovery review, travels, etc." (Doc. 73-1 at 8).

DOC initially refused the iPads because they were prohibited by Alaska Statute § 33.30.015, according to defense counsel. (Doc. 73 at 3). Though enacted before the existence of iPads and other tablets, the statute prohibits possession of computers by inmates in their cells. (Doc. 73 at 6; ALASKA STAT. § 33.30.015). Defense counsel initially asked the Court to find the state statute unconstitutional, arguing access to those devices are necessary to preserve defendants' constitutional rights to access to counsel and discovery during the pandemic. (Doc. 73 at 11).

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 14

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 14 of 35

**D. Department of Corrections response to defendants' iPad proposal**

After the State of Alaska intervened in this case, DOC and the defendants stipulated that (1) the Court need not reach the constitutionality of Alaska Statute § 33.30.015 to provide the defendants adequate relief and (2) defendants do not need access to iPads specifically, but increased access to other computers could provide the defendants with adequate relief. (Doc. 99 at 2; Doc. 115 at 49 & 138).

> **1. Alaska Statute § 33.30.015 does not prohibit the possession of computers outside inmates' cells.**

As mentioned *supra*, defense counsel were told by DOC that providing iPads to inmates was prohibited by Alaska Statute 33.30.015, according to defense counsel. (Doc. 73 at 3). However, after the State of Alaska joined this case as intervenor, the DOC stated that it does not interpret Alaska Statute 33.30.015 to prohibit inmate computer use or possession **outside** the cell. (Doc. 99 at 2; Doc. 115 at 49). It is DOC's policy that inmates are not allowed to have possession of computers, including iPads, in their cells, but these devices are not necessarily barred outside their cells. (Doc. 115 at 50). Therefore, the court need not reach the constitutionality of the statute.

> **2. Internet access was not sufficiently disabled on the iPads.**

After internet access was supposedly disabled on the iPads supplied by the Federal Defenders, Mr. Hough was provided an iPad for inspection. (Doc. 100 At 2). Despite the internet browser having been disabled, Mr. Hough was able to connect to the internet and access his email as well as the Microsoft Teams videoconferencing, all in less than two minutes. (Doc. 115 at 70). Mr. Hough pointed out that DOC does not have an internet system that could offer inmates a secure platform for tablets. (Doc. 115 at 70). For those reasons, Mr. Hough cannot

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 15

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 15 of 35

allow tablets for use by inmates inside or outside their cells. (Doc. 115 at 70). If the defense can provide devices that are in fact unable to connect to the internet, DOC would re-evaluate that possibility. (Doc. 115 at 70-71). Hough warned that inmates are extremely proficient at getting around internet-disabling efforts, citing an instance at Goose Creek Correctional Center where an inmate got on the internet after DOC was "assured by several people that it was impossible." (Doc. 115 at 73).

Mr. Hough expressed many concerns with inmates having unsupervised internet access. (Doc. 115 at 74). There is the risk of inmates using the internet to (1) coordinate escapes, (2) run criminal enterprises from prison, (3) harass or intimidate witnesses and/or victims, and (3) coordinate contraband drops at the prison. (Doc. 115 at 74). For all those reasons, Mr. Hough opposes the unsupervised use of the acquired iPads by inmates at DOC facilities. (Doc. 100 at 2).

Bruce Johnson, investigator at the Federal Public Defenders office, agreed the iPads are "vulnerable" to misuse by inmates. (Doc. 115 at 140). Defense counsel no longer seek iPad use as requested relief in this case. (Doc. 115 at 138). During the hearing, defense counsel argued for resumption of in-person attorney-client conferences. (Doc. 115 at 44-46, 163).

### E.  The United States' proposed solutions

The United States argues that sufficient access to counsel and discovery can be provided through (1) paper or electronic discovery review dropped off at the DOC facility, (2) Polycom videoconference with counsel, utilizing the share screen feature, and/or (3) by having the U.S. Marshal Service escort the inmate from the prison to the U.S. Federal Building in Anchorage, to meet with counsel. (Doc. 75 at 5).

None of the co-defendants in this case have requested an in-person meeting at the Federal Building and the U.S. Marshal Service in Alaska has not received a request for this service from

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                        16

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 16 of 35

any federal inmate since July 14th. (Doc. 115 at 186). Mr. Hough testified that this is a feasible solution for the DOC, but that the Marshals have expressed to him it is not feasible for them. (Doc. 115 at 117).

Chief Deputy of the U.S. Marshal Service, John Olson, testified that, at maximum the Marshals could transfer two inmates in the morning from 9:00 a.m. to 11:00 a.m. and two in the afternoon from 1:00 p.m. to 3:00 p.m. to their offices at the Federal Building. (Doc. 115 at 185). One inmate could be housed in the regular holding cell, and one could be housed in the segregation cell. (Doc. 115 at 183-84). Counsel could then come into those areas, outside the cell, where they could meet with their clients in-person. (Doc. 115 at 185). The Marshals would be watching on closed circuit television, so they could monitor the meeting for security reasons, but would not hear the contents of the discussions. (Doc. 115 at 185).

Defense counsel would be subject to a search by the U.S. Marshals, which would amount to more than the screening required to get into court. (Doc. 115 at 185). The inmate would be strip searched before re-entry into the prison. (Doc. 115 at 185). The inmate would also be quarantined for 14 days before being released into general population. (Doc. 115 at 41-42). During this 14-day quarantine, when space is not available in the module set aside for quarantine, the inmates are housed in the same segregation cells that are used for punitive segregation. (Doc. 115 at 85-86). Though they would be allowed access to phones and computers for discovery review, they would not have access to television or be allowed to congregate with others. (Doc. 115 at 85-86). Further, Mr. Olson noted that there is a chance that the inmate's possessions will be taken from his cell while he is away quarantining for 14 days. (Doc. 115 at 188).

Mr. Olson noted that this would not be without COVID risk; by putting U.S. Marshal

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                    17

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 17 of 35

Deputies in direct contact with inmates they risk bringing COVID into facilities. (Doc. 115 at 184). Mr. Olson is also concerned with "circumventing the State of Alaska and their procedures to keep prisoners safe," stating, "that puts my relationship with DOC in a bind." (Doc. 115 at 184). The U.S. Marshal Service prefers not to bring inmates to counsel meetings, according to Mr. Olson. (Doc. 115 at 187).

When asked by defense counsel if he could simply call up the U.S. Marshal Service and ask for his client to be brought over to the federal building for a meeting, Mr. Olson replied, "that is a great question . . . I don't know." (Doc. 115 at 189-190). Currently, there is no policy in place to implement Marshal inmate transport; rather, Olson admits it "was an offer made by [the Marshal Service] if push came to shove." (Doc. 115 at 190).

### F. Solutions proposed by the Department of Corrections

The DOC has offered potential solutions to increase inmate access to counsel and discovery at DOC and prevent further pretrial delays during COVID. Some of these proposals were already underway at the time of the evidentiary hearing, others were brainstormed during the hearing, and the details have since been worked out by the parties.

#### 1. Increased computer availability to inmates

DOC has increased the number of computers available to inmates for discovery review and videoconference with counsel since it began implementing COVID restrictions. DOC plans to continue to increase computer capacity. Mr. Hough testified, "especially with the limitation of attorney-client visitation . . . we have been doing everything we can to expand access for folks to be able to review discovery." (Doc. 115 at 36).

##### a. DOC's computer plans

During the August 28 evidentiary hearing, Mr. Hough discussed DOC's plans to provide

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                18

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 18 of 35

additional computers for use by inmates to access discovery and meet with counsel. As mentioned *supra*, Mr. Hough testified that ACC had acquired 14 non-networked computers as of August 28. (Doc. 115 at 16-17). Non-networked computers are used by inmates to view electronic discovery or access the prison's digital law library. (Doc. 115 at 122-23).

DOC also planned to obtain computers that are connected to the internet but are housed in a locked, secure frame and are without a keyboard or mouse, for use by inmates to meet with counsel and review discovery together. (Doc. 115 at 75). These computers will utilize the Microsoft Teams application to enable attorney-client videoconferencing. (Doc. 115 at 35). With Microsoft Teams, counsel can share their screen with clients to jointly review discovery and legal documents. (Doc. 115 at 31). DOC opted to use the Microsoft Teams application because it is more secure than alternative videoconferencing applications, and sessions cannot be recorded without notification to all parties. (Doc. 115 at 31, 35-36). Unlike Polycom, DOC is confident that Teams will allow easy screen sharing of media and documents. (Doc. 115 at 35).

These computers will be placed on dollies, so that they can be moved throughout ACC. (Doc. 115 at 17-18). A correctional officer will set up the meeting, ensure everything is operational, and provide the inmate with a private conference with counsel. (Doc. 115 at 33). The process of reserving a videoconferencing time will be the same as reserving time for private attorney phone calls: counsel will reach out to the DOC to schedule a meeting. (Doc. 115 at 34-35). DOC intends to accommodate those meetings with one-day notice. (Doc. 115 at 34-35).

### b. Computers available for attorney-client conferences on August 28

Two Teams-enabled computers became operational on August 28 at ACC. (Doc. 115 at 33). Mr. Hough testified that seven additional Teams computers would be set up at ACC by September 4. (Doc. 115 at 34). DOC's goal is to have a total of 41 Microsoft Teams computers

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 19

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 19 of 35

throughout their state facilities. (Doc. 115 at 32).

### c. Status of computer availability for attorney-client conferences as of September 22

As of September 22, there are still only two operational Microsoft Teams-enabled computers at ACC. (Doc. 124 at 2). DOC has ordered 12 more computers to be used for Microsoft Teams videoconferencing with counsel at ACC. (Doc. 124 at 2). Those computers have not yet arrived, and DOC does not have an estimated delivery date. (Doc. 124 at 2).

### d. Status of computer availability for private discovery review as of September 22

As of September 22, there are 15 non-networked computers available to inmates to view discovery by themselves at ACC. (Doc. 124 at 2). Mr. Hough stated that this number fluctuates as computers break and are repaired. (Doc. 124 at 2).

### 2. In-person drop box for discovery materials

Prior to the evidentiary hearing, Mr. Hough was unaware that the suspension of in-person mail drop off at DOC facilities was problematic for defense counsel. (Doc. 115 at 40). However, defense counsel regularly delivered discovery and legal documents directly to the prison before the pandemic. (Doc. 115 at 136). Inmates now face significant delays in receiving discovery as it must be sent via U.S. mail. (Doc. 115 at 139).

### a. DOC's drop box plans at the time of the evidentiary hearing

After learning of this problem during the evidentiary hearing, Hough stated that he "can come up with some solutions for having some sort of drop box outside or something like that." (Doc. 115 at 40). In fact, a drop box already exists outside ACC that is used by bail bondsmen for bail paperwork. (Doc. 115 at 95-96). Hough was confident he could have a solution within a week after the hearing. (Doc. 115 at 40). Mr. Johnson from the Federal Public Defenders Office

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                    20

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 20 of 35

agreed that the addition of a drop box or hand-delivery location at DOC facilities would assist in getting discovery material to the clients and responses from the defense in a timely manner. (Doc. 115 at 138-39).

### b. Status of in-person mail drop off as of September 22

There is currently no drop box for in-person delivery of discovery at ACC. (Doc. 124 at 3). This effort has seemingly ended; Mr. Hough stated in his supplemental affidavit that DOC's workgroup "agreed that the U.S. Postal Service is the preferred way to send discovery thumb-drives to DOC." (Doc. 124 at 3). DOC can accommodate any urgent legal document and discovery needs by contacting the facility. (Doc. 124 at 3). It is unclear whether the DOC workgroup includes representatives from the defense. (Doc. 134). However, defense counsel filed no objections to the statements contained in Mr. Hough's supplemental affidavits after given the opportunity to do so. (Doc. 127).

### 3. Process to alert DOC when discovery materials are under Court Protective Order

Previously, DOC did not allow defense counsel to send any discovery to inmates via thumb drive, according to Mr. Johnson. (Doc. 115 at 138). However, DOC now prefers the use of thumb drives over compact discs. (Doc. 115 at 47). The defense also prefers to use thumb drives, especially after finding out iPads were vulnerable to abuse; Mr. Johnson testified he "thought it was actually a good idea and it could solve a lot of problems." (Doc. 115 at 138). It must still be determined how to ensure that any discovery on the thumb drives subject to a protective order does not get distributed within the facility.

As noted *supra*, before the COVID pandemic, protective court orders did not allow defense counsel to leave the protected discovery in the custody of the defendant, in an effort to

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 21

insure it was not shared with others. The orders did allow counsel to bring certain discovery documents with them to in-person meetings, show and discuss the discovery with their clients, and take it with them after the visit. Under COVID restrictions, inmates can check out thumb drives containing protected discovery from correctional officers, review it on a DOC computer, then return it to DOC. However, it is up to the inmate to inform the officer that the material is subject to a protective court order and they must review it in private. (Doc. 115 at 19-20, 52-53, 90). At the time of the hearing, there was no process of marking protected discovery so that DOC personnel were alerted that only the inmate may view it. (Doc. 115 at 19-20, 90).

Mr. Hough was unaware this was a problem, stating, "some offenders do not particularly care if their discovery is out there or not, and . . . I wouldn't say that that should be left up to a [correctional officer] to be making that legal decision for the offender." (Doc. 115 at 20). When this Court raised concern about allowing protected materials to be shared, Hough admitted that "it is not out of the realm of possibility that [inmates] could secret some images, hit the print button and do something else and share that information." (Doc. 115 at 90-91).

However, Hough quickly began to solve the problem, stating that a letter, or something, could accompany the thumb drive, which would help alert DOC officials of the protective status of discovery. (Doc. 115 at 91). Counsel for the State of Alaska was not sure whether a letter would be enough but stated that Mr. Hough and Mr. Johnson would brainstorm after the hearing and come up with a solution. (Doc. 115 at 153). This Court also noted that protective orders in this case, and others, may need revision to reflect the current COVID measures at DOC facilities. (Doc. 115 at 151).

As of September 22, DOC and defense counsel were still negotiating over the development of a system to alert correctional officers when an inmate reviews protected

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                22

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 22 of 35

discovery. (Doc. 125 at 3). Under the current draft procedures, counsel is to send the thumb drive containing protected discovery by U.S. mail, housed in a bright red envelope. (Doc. 124-1 at 1-2). A copy of the relevant protection order is to be attached to the envelope. (Doc. 124-1 at 1). Upon receipt, the DOC facility will notify the inmate that he has protected discovery for review. (Doc. 124-1 at 1). DOC will keep the protected discovery in the inmate's personal property box while not being viewed. (Doc. 124-1 at 1).

### 4. Requests for additional staff to coordinate COVID efforts

The implementation of the above measures will require additional DOC personnel. (Doc. 115 at 61-62). In August, Mr. Hough sought funding to hire individuals "to facilitate the administrative functions of running these attorney-client computers so that we have dedicated people . . . taking the appointments, making the appointments, and ensuring that the offenders are at the right place at the right time." (Doc. 115 at 61-62). He called these positions "PCNs." (Doc. 115 at 61). PCNs will coordinate inmates' use of the Microsoft Teams computers. (Doc. 115 at 61). At the time of the hearing, those requests had not yet been approved by the DOC. (Doc. 115 at 62). If they are denied, Mr. Hough testified that he would then "commit to doing more with less, which . . . is not ideal." (Doc. 115 at 62). Hough added he "can probably come up with some other staffing solutions," using existing personnel. (Doc. 115 at 63).

### III. APPLICABLE LAW

#### A. Jurisdiction over challenges to conditions of confinement by pretrial detainees within a criminal case

Generally, pretrial detainees may only challenge their conditions of confinement in a civil action brought pursuant to (1) *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, (2) 42 U.S.C. § 1983, or (3) 28 U.S.C. § 2241. *See United States v. Yandell*, No. 2:19-

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                                    23

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 23 of 35

CR-00107-KJM, 2020 WL 3858599, at *4 (E.D. Cal. July 8, 2020) (citing *United States v. Luong*, No. CR 99-433 WBS-GGH, 2009 WL 2852111, at *1-2 (E.D. Cal. Sept. 2, 2009)); *Bivens*, 403 U.S. 388, 389 (1971). Courts disfavor attempts to litigate conditions of confinement as motions in a defendant's criminal case. *Luong*, 2009 WL 2852111, at *1–2. Since, "[p]ermitting defendant to file grievances in his criminal proceeding not directly related to his ability to exercise his rights in that proceeding would circumvent his obligation to exhaust administrative remedies before seeking redress in court." *Id.*

However, one exception to this rule is where a pretrial detainee challenges the conditions of their confinement that infringe upon their ability to consult with counsel or exercise other trial rights. *Yandell*, 2020 WL 3858599, at *4; *United States v. Wade*, No. 3:07-cr-00111-RRB-JDR, 2009 WL 3837151, at *1 (D. Alaska Nov. 13, 2009) (acknowledging "that the Court does have jurisdiction to consider whether the conditions of [a pretrial detainee's] confinement prevent him from aiding his attorneys in his defense and obtaining a fair trial.").

**B. Constitutional rights of pretrial detainees**

The Sixth Amendment extends a right to effective assistance of counsel to all criminal defendants. U.S. CONST. amend. VI. This right attaches at the time of the defendant's first appearance before a judicial officer, where the defendant is made aware of accusations and restrictions of liberty are imposed. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 194 (2008). The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. This includes access to courts to challenge their convictions and to seek and receive the assistance of counsel. *Procunier v. Martinez*, 416 U.S. 396, 419(1974) (*overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

**1. A prison regulation impeding inmates' rights may be upheld under *Turner*.**

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                    24

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 24 of 35

Prison regulations that impede an inmate's constitutional rights will nevertheless be upheld if the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The court in *Turner* identified four factors for courts to use when assessing the reasonableness of a prison regulation: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact . . . the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources," and (4) "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id*. at 89-90 (internal quotation marks omitted).

### a. Factor 1: Rational Connection

A rational connection exists where prison administrators can articulate the "logical connection between the regulation and the asserted goal." *Id*. at 89. To strike down a regulation, the connection must not exist or be "so remote as to render the policy arbitrary or irrational." *Id*. at 89-90. This is particularly hard to demonstrate where the regulation "operated in a neutral fashion." *Id*. at 90. The burden is on prison authorities to "first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990). General assertions from prison administrators that a policy "clearly has a logical connection to legitimate governmental interests" is not enough. *Id*. at 387.

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                      25

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 25 of 35

### b. Factor 2: Alternative Avenues

If there are alternative ways a prisoner can exercise their asserted right, then the prison regulation is less likely to violate the Constitution. *Turner*, 482 U.S. at 90. If alternatives exist, "courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Id.* (internal quotation marks omitted). Alternatives are interpreted broadly; if a prisoner can still exercise the asserted right in any similar, though not identical way, the prisoner's constitutional rights are preserved. *See Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999).

### c. Factor 3: Cost of Accommodation

"When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials." *Turner*, 482 U.S. at 90 (internal quotation marks omitted). Here, the right of the prisoner is weighed against the rights of other prisoners and prison employees, and where "the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, we should defer to the informed discretion of corrections officials." *Mauro*, 188 F.3d at 1062 (internal quotation marks omitted). Deference to prison administrators is due "[w]hen the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue." *Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 976 (9th Cir. 2010).

### d. Factor 4: Exaggerated Response

"[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable" and is therefore an exaggerated response to the prison administrator's concerns. *Turner*, 482 U.S. at 90. This does not mean a prison must use the least restrictive alternative, but

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 26

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 26 of 35

"if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests" a court may find that is evidence of unreasonableness. *Id*. at 90-91. Here, the burden is on the inmate to "point to an alternative that accommodates their rights at *de minimis* cost to security." *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993) (citing *Turner*, 482 U.S. at 91). What other prisons are doing may help determine the feasibility of alternatives. *Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir. 2001) (Inmate successfully challenged prison's prohibition of magazine subscriptions after the court found the prison can distinguish between junk mail and magazine subscriptions at *de minimis* cost by looking at another prison's practices).

### e. *Turner* factors applied to prisons' response to COVID

In August 2020, the Southern District of California applied the *Turner* factors to a case challenging a California prison's COVID-19 policies. *United States v. Kemmerer*, No. 3:19-CR-02513-GPC, 2020 WL 4697982, at *9 (S.D. Cal. Aug. 13, 2020). The inmate challenged the prison's COVID response as violating his Sixth Amendment right to counsel. *Id*. at *9. The court concluded that the restrictions on communication with counsel due to the prison's COVID response was reasonable to ensure the safety of prisoners and prison staff, as each *Turner* factor weighed in support of the prison regulations. *Id*. at *9-11.

First, prison administrators provided a rational connection between its COVID response and legitimate objectives, the safety of inmates and prison staff. *Id*. at *9. Next, although in-person visitation with counsel had been suspended, the court found alternative means of communication existed; "when viewed sensibly and expansively, [the inmate's] right to communicate confidentially with counsel could have been exercised through at least three other avenues: emails, legal mail, and a scheduled phone call." *Id*. at *10 (internal quotation marks

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                27

omitted). Next, the court noted that the inmate also failed to "show how accommodating his request would have had a minimal impact [on] guards and other inmates, and on the allocation of prison resources generally," since installing new phones and requiring additional personnel to assist with calls is a considerable cost. *Id.* (internal quotation marks omitted). Lastly, given the increased demand for phone calls, the court found that the prison policy was not an exaggerated response, particularly since the inmate did not offer evidence of how other prisons have more adequately provided access to counsel during COVID. *Id.*

### 2. *Bell* punitive test for violations of Due Process of pretrial inmates

Restrictions implicating a pretrial detainee's due process rights under the Fifth Amendment are unconstitutional if they amount to punishment of the detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To prove punishment the detainee must show (1) "an expressed intent to punish on the part of detention facility officials" or (2) that the restriction is not reasonably related to a legitimate government objective. *Id.* at 538-39. Punishment under *Bell* "must cause harm or disability that either significantly exceeds or is independent of the inherent discomforts of confinement." *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017) (internal quotation marks omitted). Further, "in the absence of evidence of express intent, [courts] may infer an intent to punish if the restriction or condition is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective." *Id.* (internal quotation marks omitted).

In a recent district court case in Central District of California, an inmate challenged his pretrial detention during COVID as violating his rights under the due process clause. *United States v. Villegas*, No. 2:19-CR-568-AB, 2020 WL 1649520, at *1 (C.D. Cal. Apr. 3, 2020). The court rejected his challenge under the *Bell* punitive test, stating "even if pretrial detention during

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 28

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 28 of 35

a worldwide pandemic seems punitive in the lay sense, that restriction cannot violate due process unless there is also an express intent to punish with no rational relationship to legitimate government interests." *Id*. at *2 (citing *Bell*, 441 U.S. at 538-39).

## IV. DISCUSSION

### A. The Court has jurisdiction over the defendants' claims.

Defendants have raised constitutional claims which implicate their trial rights—the right to access and consult with their attorneys and to review the discovery in their case. When trial rights are implicated, as is the case here, courts have jurisdiction to hear those motions within the criminal case. *Yandell*, 2020 WL 3858599, at *4; *Wade*, 2009 WL 3837151, at *1. Moreover, the alleged constitutional injuries impact this Court's administration of this case. Accordingly, the Court has jurisdiction to consider Defendants' Motion in the context of this criminal case.

### B. Findings of Fact

The Court notes that no evidence has been offered by Mr. Topps or Mr. Cross regarding their inability to meet with counsel or view discovery. Mr. Glover has not established that he had trouble accessing private phone calls with counsel.

#### 1. Inadequate opportunity for attorney-client conferences

Testimony from Mr. Glover and Mr. Hough established that Polycom computer units are difficult to use and have limited availability for videoconferencing with counsel and viewing discovery. The Court notes that phone calls alone are insufficient for many inmates, such as Mr. Glover, to establish an attorney-client relationship that the defendant is then willing to rely upon when deciding whether or not to go to trial. Videoconferencing between attorney and client is an alternative avenue for developing that relationship in the absence of in-person consultation. The cost of this accommodation—the addition of 12 computers—is a reasonable cost the DOC is able

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                        29

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 29 of 35

and willing to undertake, according to Mr. Hough.

## 2. Unacceptable delay in arranging individual review of discovery

Mr. Glover established a record of having difficulty when seeking to review digital discovery by himself while in custody. Mr. Glover had to submit three written requests and make two personal inquiries before having a one-and-a-half-hour opportunity to review discovery. This process took four weeks to complete. A four-week delay in accessing discovery is unacceptable and slows the administration of justice. The plan to increase the personnel available to schedule, maintain, and operate the computers for individual discovery review, as well as the Microsoft Teams-enabled computers for attorney-client conferences, will hopefully avoid such problems in the future.

## 3. Review of discovery with counsel in courthouse holding cells is not feasible.

The Court further finds the government's suggestion that attorney-client meetings and joint review of discovery could take place in the courthouse holding cells of the U.S. Marshal Service, is not a feasible solution in light of Chief Deputy Olson's testimony.

## C. *Turner* analysis favors the Department of Corrections' COVID response.

Under *Turner*, the DOC's suspension of in-person visitation with counsel and other COVID restrictions are reasonably related to protecting the safety of inmates and prison staff, particularly in light of recent DOC efforts to accommodate inmates by: (1) obtaining additional computers in private rooms for discovery review, (2) obtaining Microsoft Teams-enabled computers for videoconferencing with counsel and viewing discovery, (3) the repurposing of all available rooms for private attorney-client phone calls, (4) developing DOC's process for alerting officers when discovery subject to a protective court order is being viewed by inmates, and (5) ensuring the availability of orientation and prisoner handbooks to pretrial inmates upon

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                          30

their arrival to a DOC facility. Many of these solutions were facilitated by litigation, and the

Court is hopeful that the defendants' constitutional rights will be preserved when DOC fully

implements these measures.

### 1. The recent restrictions are rationally connected to preventing COVID outbreaks.

The DOC's recent restrictions on counsel and discovery access are aimed at (1)

preventing the introduction of COVID to DOC facilities and (2) isolating its spread once it's

there. (Doc. 115 at 84). DOC's COVID measures are rationally connected to these valid

penological goals.

The DOC made its decision to suspend in-person visitation based on CDC guidance for

detention centers and on the advice of DOC's Chief Medical Officer. (Doc. 115 at 22). Mr.

Hough testified with specificity as to how in-person visitation may lead to the introduction of

COVID into DOC facilities. (Doc. 115 at 80-81, 118-20). Particularly worrying for the DOC is

the inability of inmates to social distance inside the prison. (Doc. 115 at 82, 119-20). Prison

populations generally have poorer health and are, on average, older than the general public.

(Doc. 115 at 81). DOC is further worried about how to maintain order if an outbreak were to

occur. (Doc. 115 at 84). DOC's COVID restrictions are in constant review, and normal prison

operations will begin as soon as it is safe. (Doc. 115 at 22-24). These concerns provide ample

support for DOC's suspension of in-person visitation.

### 2. The defendants can meet with counsel and review discovery via alternative avenues.

The DOC has plans to implement alternative ways for inmates to confer with counsel and

review discovery, leaving the defendants not entirely without access to counsel and discovery.

Though in-person visitation is suspended, inmates at DOC facilities can currently meet with

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 31

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 31 of 35

counsel through private phone calls and, in the future, by videoconference with screen share capabilities; and counsel can mail discovery materials to the prison and inmates can review that discovery on computers unconnected to the internet.

Speaking to counsel via phone call and videoconference is less than ideal for Mr. Glover, as he would prefer in-person counsel visits. (Doc. 115 at 163). However, Glover can still exercise his asserted rights in a similar manner. *See Mauro*, 188 F.3d at 1061. In *Mauro*, the court found that there were alternative means of exercising an inmate's right to sexually explicit material, because "although the policy bans all sexually explicit materials depicting frontal nudity, it does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females." *Id*. Similarly, in *Kemmerer*, the court found that even when phones were unavailable to an inmate for two weeks, mail and email contact were enough to provide the inmate his right to counsel. 2020 WL 4697982 at *10.

Here, defendants can speak with counsel via private phone call, by Teams videoconference in the near future, and through mail; and they can review discovery during Teams videoconference or on a computer unconnected to the internet. If provided, these alternative means of access to counsel and discovery appear sufficient, even if they are not identical to the defendants' requested relief.

### 3. Accommodating in-person visitation would have significant impacts on other inmates and prison staff.

The health and safety of other DOC inmates and facility staff would be at risk if in-person visitation resumed. Mr. Hough testified that a potential COVID outbreak would put the entire prison population at risk, since social distancing is not possible within general population. It would also expose prison staff to greater risk of COVID. Further, DOC plans to utilize prison

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                32

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 32 of 35

resources in order to accommodate inmates' rights—such as acquiring new computers, repurposing visitation rooms for private phone calls, and hiring additional staff to coordinate attorney-client contact.

When the ability of prison administrators to protect the health of people in their care is at issue, as is the case here, courts should defer to the informed discretion of those officials. *Bull*, 595 F.3d at 976. The DOC continues to consult with experts when making decisions about restricting access during COVID. (Doc. 115 at 22-24). Through this informed process, the DOC concluded that the rights of DOC inmates and personnel to be free from increased COVID exposure outweighed the defendants' rights to in-person visitation with counsel.

**4. The COVID restrictions at issue are not exaggerated.**

Though some prisons currently allow in-person visitation (Doc. 115 at 46), DOC's decision to suspend visitation is not exaggerated, in fact, those measures have proven very effective. Mr. Hough testified that there have been no deaths from COVID exposure in DOC facilities and that only three of DOC's positive COVID results have been due to internal transmission—the rest were newly remanded inmates caught during the testing and quarantine phase of detention. (Doc. 115 at 45-46). Further, DOC is following CDC and medical professional guidance. (Doc. 115 at 23).

Whether or not other detention centers across the country are allowing in-person visitation with counsel, *Turner* does not require prisons to use the least restrictive alternative, particularly where that alternative would have more than a *de minimis* cost to valid prison interests. *Turner*, 482 U.S. at 90-91; *Casey*, 4 F.3d at 1523. Mr. Hough articulated how allowing in-person visitation would jeopardize the effectiveness of DOC's COVID response. (Doc. 115 at 80-81, 118-20). The defense has failed to identify a feasible alternative to suspending in-person

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                      33

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 33 of 35

visitation that would not create additional risk of COVID exposure in DOC facilities.

**D. The COVID restrictions are not punitive under *Bell*.**

As pretrial detainees, the defendants in this case must not be subject to punitive measures. *Bell*, 441 U.S. at 353. Through briefing on this motion, the government suggested that the defendants request escort by the U.S. Marshal Service in order to meet and confer with counsel. (Doc. 75 at 5). However, were an inmate to leave the prison, they would be subject to at least a 14-day quarantine upon their return. (Doc. 115 at 41-42). During this time, they would be isolated, without access to television, and would risk theft of their personal possessions left unmonitored in their general population cells. (Doc. 115 at 42, 85-86, 188).

Even so, the additional quarantine does not rise to punishment sufficient to trigger a due process violation under *Bell*. First, there is no express intent to punish by the DOC when setting this quarantine policy. Second, DOC has articulated how a 14-day quarantine in isolation is reasonably related to prevention of introducing COVID into DOC prison populations. This is not an excessive measure given the vulnerabilities of prison populations and the inability of inmates to remain socially distant when released into general population.

## V. CONCLUSION

As of today, Mr. Glover has been in custody for over seven months. His Motion for Access to Counsel and Discovery was filed on July 14. The evidentiary hearing was held on August 28. Counsel for DOC was given a month to provide supplemental information to the Court about when additional computers would be installed to facilitate attorney-client conferences and joint review of discovery. No certain date has yet been provided. Although the Court is disappointed that the State of Alaska has not indicated when those additional computers will be available, the Court appreciates the efforts of the Department of Corrections to improve

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                34

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 34 of 35

inmate access to attorneys and discovery.

Currently, two Microsoft Teams-enabled computers are in operation at ACC. Though neither party provided information about the total number of inmates at ACC who must share these computers, there are 116 federal inmates. Only two computers which are readily available for videoconferencing appears inadequate. The Court is hopeful that the 14 Microsoft Teams-enabled computers, which DOC plans to have installed at ACC, will provide meaningful attorney-client communications guaranteed by the Sixth Amendment. As a result, the Court recommends the District Court order that the 14 Microsoft Teams-enabled computers, along with adequate personnel to schedule, maintain, and operate those computers, be online and available to inmates by **November 15, 2020**.

Should defendants have trouble in the future receiving adequate time for attorney-client conferences by phone or videoconference or adequate time for electronic discovery review, this motion may be renewed. However, the Court would expect the defense to be prepared with evidence of when their requests were made and the outcome of each request. Should the DOC fail to meet the Court's deadline, defendants may apply for temporary release pursuant to 18 U.S.C. § 3142(i) for the purpose of trial preparation.

For the foregoing reasons, the Court recommends DENIAL without prejudice of the defendants' Motion for Reasonable Access to Counsel and Discovery at Docket 73.

DATED this 1st day of October, 2020 at Anchorage, Alaska.

/s/ Deborah M. Smith
CHIEF U.S. MAGISTRATE JUDGE

*United States v. Topps et al.*
3:20-cr-12-TMB-DMS
R&R re Mtn for Access to Counsel                                                                 35

Case 3:20-cr-00012-TMB-MMS   Document 135   Filed 10/01/20   Page 35 of 35